668 S.E.2d 425

**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,**

v.

**SCOTT K. and Nedra K., Appellants.**

**In the interests of A.K. and C.K., minor children under the age of 18.**

**No. 4443.**

Court of Appeals of South Carolina.

Heard Sept. 17, 2008.

Decided Oct. 14, 2008.

LeLand M. Malchow, of Augusta, GA, for Appellant.

Nedra K. John A. Donsbach, of Martinez, GA, for Appellant.

Scott K. Dennis M. Gmerek, of Aiken, for Respondent.

HEARN, C.J.:

This appeal arises from a family court order granting the South Carolina Department of Social Service's request to order Nedra K. (Mother) and Scott K. (Father) to comply with a Treatment Plan. We reverse.

## FACTS

On October 20, 2006, the Aiken County Department of Social Services (DSS) received a call about Mother and Father's home, reporting, "there are bags of trash with maggots in them throughout the house ... there is dog feces and dog urine on floors ... there was the smell of marijuana in the home and marijuana smoke was seen." Ten days later, sheriff's deputy Ken Blackwell accompanied DSS caseworkers Kendra Upton–Williams and Evelyn Perry on an unannounced visit to the home.

When Blackwell entered the home, he observed "several bags of trash in the kitchen and dirty dishes in the sink. The living room ... was really cluttered with a lot of books and stuff stacked around." Upton–Williams recorded her impression of the family's home in a report:

[The home was] cluttered with bags of trash and toys, trash thrown about the home, stains on the carpet, the staircase is lined with debris, the front door is barricaded with debris and a small shelf, the utility/storage room is filled with boxes of unknown items that ha[ve] been there since the couple moved into the home.... The bottom of the floors in [the children's] room[s] cannot be seen in full.

Furthermore, Upton–Williams testified she discussed the condition of their home with Mother and Father; Mother said she "becomes overwhelmed and depressed when it is time to clean her home," and Father said he tried to develop a reward system to encourage the children to clean their rooms. On cross-examination, Upton–Williams admitted she found nothing in the family's home consistent with the allegations reported to DSS—no dog feces, no urine, no maggots, and no marijuana.

Mother's testimony regarding the condition of her home that day provides a different perspective:

> We were trying to get our house situated and the basement
> stuff done.... Our living room at the time had a bookcase
> in it to where we could get the stuff from [child's] room
> picked up and books put on shelves.... [T]he stuff out-
> side[,] we were getting ready to take to Goodwill to make
> room in our house because we had no storage.

Father testified and explained the children were spending the
week at their grandparents' home, while he and Mother were
"cleaning the house and going through ... boxes, rearranging
things, painting ... rooms, [and] doing a whole bunch of
things with the house."

At the conclusion of their visit, Upton–Williams and Perry
determined the physical condition of the home placed Mother
and Father's children at "serious risk of harm." DSS asked
Mother and Father to voluntarily comply with a "Safety Plan"
it developed. The Plan required the children to remain with
their grandparents, who would serve "as protectors" of their
grandchildren and stated DSS would give Mother and Father
three days to discard all trash, clean the home, make the beds
with clean linens, and obtain drug screens. Mother testified
she and Father initially had refused to sign the Plan, but they
capitulated after DSS told them if they refused: "[O]ur kids
would be taken away, and the officer would escort us out of
the room, and we would be arrested."

Upton–Williams returned to the family's home two days
later. She testified it now was clean and acceptable, and DSS
allowed the children to return home. The following day, she
reviewed the results of Mother's and Father's drug tests,
which were negative. Upton–Williams testified she told Moth-
er and Father the Plan would remain in effect, and DSS would
"be coming back to the home to make unannounced visits,"
until DSS made a "case decision."

Upton–Williams prepared a Determination Fact Sheet to
"let the family know [the] case [was] indicated" for physical
neglect of the children based on the condition of the home.
Upton–Williams noted on the Fact Sheet:

> [Father] does not see anything wrong with the condition of
> his home and feels that his case should be unfounded as
> none of the allegations were true. Although the home had
> been cleaned by 11/01/06, [Father] would no longer allow

DSS back into his home. [Father] feels that his rights have been violated by DSS and the Aiken County Sheriff's Office.

Mother testified regarding the disruptive impact of the DSS investigation on her children's lives. She stated the children had been making A's and B's before DSS started its investigation; however, their grades began to drop because, "DSS was visiting [the children] at school and it was embarrassing to them. They were waking up at various times of the night[,] afraid DSS was going to take them away."

DSS concluded its investigation on November 20, 2006, and it classified the reported allegations as "indicated for physical neglect due to the condition of the home of the parents." Thereafter, DSS developed an "In–Home Treatment Plan," and required Mother and Father to comply with it for six months. The Plan instructed Mother and Father to: (1) keep the home clutter-free and pest-free; (2) wipe down the walls; (3) remove clothing from floors; (4) clean and maintain all rooms in the house; (5) dispose of plastic bottles, old shoes, and other items in the front yard; and (6) put clean linens on the beds. DSS stated it would monitor compliance through unannounced visits, photographs, and review of the children's school records. Mother and Father refused to sign the Plan and notified DSS they wanted to appeal its case determination. In March 2007, DSS brought an action alleging Mother and Father's children were physically neglected, they had failed to follow the treatment plan, and the "children cannot be protected adequately at this time from further harm without the intervention of [DSS] and court-ordered services."[1]

On May 24, 2007, the family court conducted an intervention hearing. Guardian ad litem (GAL) Nona Mauzy testified she had visited the family's home on April 7 and May 20, 2007. Mauzy stated the home was indeed cluttered; however, she observed no signs the children were neglected:

I thought that they had a good family working, just the way they got along together as a group.... I didn't see any

---

1. The following month, DSS amended its Treatment Plan to additionally require: (1) parenting classes; (2) Father to obtain a mental health evaluation; and (3) Mother to obtain depression screening. Noting their appeal was pending, Mother and Father refused to sign the amended Plan.

.

dissension or uneasiness or fear of any kind.... [T]he house is cluttered, very cluttered, there is no doubt about that.... I didn't feel that it was contaminated or unsanitary.... It would be unsafe for me to walk through a lot of clutter on the floor because I am elderly and not as steady on my feet.... I don't think there is a potential risk of harm right now. I really don't.

Furthermore, Mauzy interviewed Mother and Father, the children, and their grandparents and teachers before writing her report, which stated:

[Mother and Father] were cordial, polite and showed me through their home. It was cluttered but not dirty. The computer in the living room sits on a table and papers were piled all around it. There are makeshift shelves in the dining room across one wall containing groceries and some cleaning supplies. The kitchen is small and this looks like overflow from too few cabinets. I did not feel that the home was unsanitary.... The girls were clean and looked healthy. They seemed very bright and active.

The children's grandfather told Mauzy, "DSS is overstepping [its] authority and that he would gladly testify that they are good parents but clutter did not bother either of them." Mauzy testified she returned to the home a month later and found, "[t]he parents were busy replacing the makeshift shelves in the dining room with a nice, big stainless steel shelving unit." She concluded:

Based on my observations I feel [the children] are normal and well-adjusted for their ages. Both are friendly and outgoing and appear to have a normal, loving relationship with their Mother and Father. Their teachers state that they are doing well and have seen no signs of neglect. I feel that a referral for some Homemaker services could help [Mother and Father] become more organized. [Father] should obtain employment so as to support his family.

During the intervention hearing, Mother's counsel asked Mauzy why her written report recommended affirming the DSS finding that the children were at "a substantial risk of physical neglect." Mauzy replied, "[w]ell, that confuses me even." She added the GAL's office "help[s] me with phrases and terms, since I don't have the jargon. I am strictly a

volunteer." Finally, when asked if the children were at substantial risk of physical neglect, Mauzy responded: "Change that word to 'possible.'"

Following the hearing, the family court determined: (1) the allegations of DSS against Mother and Father were supported by a preponderance of the evidence; (2) the children are neglected due to the poor condition of their home; (3) the children cannot be protected from further harm without the intervention of DSS; and (4) the DSS Treatment Plan will alleviate the "danger to these children and aid [Mother and Father]." Thereafter, the family court ordered Mother and Father to comply with the Treatment Plan. Mother and Father's appeal followed.

## STANDARD OF REVIEW

"In appeals from family court, the appellate court has the authority to find the facts in accordance with its own view of the preponderance of the evidence." *S.C. Dep't of Soc. Servs. v. Meek,* 352 S.C. 523, 528, 575 S.E.2d 846, 848 (Ct.App.2002).

## LAW/ANALYSIS

First, Mother and Father argue DSS improperly classified the allegations concerning the condition of their home as, "indicated for physical neglect due to the condition of the home." Furthermore, Mother and Father contend the family court erred in finding a preponderance of the evidence supported the DSS indication and in finding the children could not be protected from future harm without intervention. As a consequence of these erroneous findings, Mother and Father assert the family court erred in ordering them to comply with the Treatment Plan. We agree.

## A. Investigating Reports of Alleged Abuse and Neglect

"Any intervention by the State into family life on behalf of children must be guided by law, by strong philosophical underpinnings, and by sound professional standards for practice." S.C.Code Ann. § 20–7–480 (Supp.2007).[2] Further-

---

2. The General Assembly amended the Code of Laws of South Carolina, effective June 16, 2008, to add Title 63, the South Carolina Children's

more, the statutory scheme for child protection is guided by the principle that, "[p]arents have the primary responsibility for and are the primary resource for their children." § 20–7–480(A)(1).

■ South Carolina law states child abuse, neglect, or harm occurs when a person responsible for the child's welfare "fails to supply the child with adequate food, clothing, shelter, or education ... and the failure to do so has caused or presents a substantial risk of causing physical or mental injury." S.C.Code Ann. § 20–7–490(2)(c) (Supp.2007). The statute provides clear guidelines to DSS for investigating reports of suspected child abuse or neglect. S.C.Code Ann. § 20–7–650 (Supp.2007). Within twenty-four hours of receiving a report of suspected child abuse or neglect, DSS must begin a thorough investigation. § 20–7–650(C). Furthermore, within sixty days, DSS must classify the report as either "unfounded" or "indicated."[3] § 20–7–650(F). "[I]t is presumed that all reports are unfounded unless [DSS] determines otherwise." § 20–7–490(10). "Just as SCDSS has the responsibility under the statutory scheme to bring meritorious allegations of child abuse and neglect before the family court, it also has the responsibility and duty to seek dismissal of those petitions subsequently determined by their investigation to be without merit." *S.C. Dep't of Soc. Servs. v. Pritcher*, 329 S.C. 242, 247, 495 S.E.2d 242, 244 (Ct.App.1997). The goal of this statutory scheme "is to protect children while avoiding intervention into the family's life if at all possible." *Id.* at 248, 495 S.E.2d at 245.

---

Code, and to transfer all provisions of Title 20, Chapter 7 to Title 63. *See* Act No. 361, 2008 S.C. Acts 3623 (stating "the transfer and reorganization of the code provisions in this act are technical ... and are not intended to be substantive"). Because Title 63 has not yet been bound, all citations to the statute refer to Title 20.

**3.** An unfounded report is one "for which there is not a preponderance of evidence to believe that the child is abused or neglected." § 20–7–490(10). On the other hand, an indicated report is "supported by facts which warrant a finding by a preponderance of evidence that abuse or neglect is more likely than not to have occurred." § 20–7–490(11). A preponderance of evidence means "evidence which, when fairly considered, is more convincing as to its truth than the evidence in opposition." § 20–7–490(13).

After DSS classifies a report as indicated, it may petition the family court for authority to intervene and provide protective services if it makes the two-pronged determination: (1) by a preponderance of evidence, the child is an abused or neglected child, and (2) the child cannot be protected from harm without intervention. § 20–7–738(A) (Supp. 2007). In this case, DSS found a cluttered home, but its investigation failed to substantiate any of the reported allegations. Moreover, there was no evidence that Mother and Father's children had been harmed or were at risk of future harm. To the contrary, all the evidence showed the children to be healthy and well nurtured; in the words of the GAL, "they had a good family." Accordingly, we find DSS erred in classifying the reported allegations. Moreover, DSS compounded its error by equating Mother and Father's marginal housekeeping skills with the neglect of their children and in finding the children cannot be protected from further harm without intervention.

## B. Family Court Intervention.

The family court can order intervention and protective services only after it finds the allegations of the DSS petition requesting intervention are supported by a preponderance of the evidence, the child is abused or neglected as defined in section 20–7–490, and the child cannot be protected from further harm without intervention. § 20–7–738(D). Because a preponderance of the evidence did not support the allegations in the DSS petition, the family court erred in ordering intervention. Accordingly, the family court's intervention order is

**REVERSED.**

HUFF, J., and KONDUROS, J., concur.